Receipt # 060912

ORIGINAL

FILED
JUL 1 2 2004
U.S. COURT OF FEDERAL CLAIMS

ECF

David W. Francis
Kelly H. Decker
Powell, Trachtman, Logan, Carrle & Lombardo, P.C
114 North Second Street
Harrisburg, PA 17101
Attorneys for Structural Concepts, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| STRUCTURAL CONCEPTS, INC.<br>Plaintiff<br><br>vs.<br><br>THE UNITED STATES OF AMERICA, DEPARTMENT OF THE AIR FORCE<br>Defendant | No. 04-1141C<br><br>Judge: ________________ |

## COMPLAINT

### The Parties

1. Plaintiff is Structural Concepts, Inc., ("SCI"), a New Jersey Corporation with Offices located at 1305 South Roller Road, Ocean, NJ 07712.

2. Defendant is the United States of America, Department of the Air Force ("the Air Force").

3. SCI and the Air Force are parties to Contract No. F28609-99-0005 (the "Contract") for the Alterations to Building 2704 Visiting Officers Quarters at McGuire Air Force Base, New Jersey ("the Project" or "VOQ 2704").

### Jurisdiction

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 because this lawsuit involves a breach of contract claim by Plaintiff SCI based upon an express contract.

5. This lawsuit is timely filed pursuant to 41 U.S.C. § 609(a) following two separate Final Decisions of the Contracting Officer.



HB:50955v1 0000-33

**Background Facts**

6. In or May, 1998 the Air Force received bids for the VOQ 2704 project, including a bid submitted by plaintiff SCI.

7. In or about January 1999, the Air Force notified SCI that it had been awarded the contract. SCI and the Air Force subsequently entered into the Contract by which SCI agreed to make certain alterations and repairs to the VOQ 2704.

8. The contract incorporated plans, specifications, and bidding document issued by the Air Force for the project.

9. Prior to and after the award of the contract, SCI was materially impacted, delayed and disrupted by numerous events beyond its control. These impacts, delays and disruptions included, but are not limited to, the following:

a. The Air Force's failure to provide SCI with a timely acceptance of its bid for the project;

b. The Air Force's untimely start for the project work;

c. The discovery of termite infestation within VOQ 2704, where such termite infestation was neither disclosed nor anticipated;

d. Errors and/or omissions in the design of the project work included in the plans, drawings and specifications;

e. Delays and suspensions of work attributable to the Air Force;

f. Improper processing of applications for payment submitted by SCI;

g. Improper attempts to impose unrealistic completion dates which did not take into account the previous and concurrent impacts, delays and disruptions to the work.

h. Failure to accept the work after it was substantially completed.

10. As a result of these delays, impacts and disruptions, SCI incurred additional costs.

11. During the course of the project, the Air Force frequently advised SCI to submit its claims for additional compensation at the conclusion of the project work.

12. In or about January, 2004 SCI filed with the Contracting Officer a claim in the approximate amount of $1.2 million ("SCI's Claim").

13. Upon information and belief, as a result of SCI's Claim, the Air Force improperly imposed liquidated damages on SCI in an amount of $776,448.00.

14. Because these liquidated damages were imposed, the Air Force has wrongfully refused to pay SCI its final contract balance.

15. On March 19, 2004 the Contracting Officer issued a Final Decision imposing the liquidated damages against SCI. A copy of this decision is attached hereto as exhibit A and incorporated by reference.

16. On June 25, 2004 the Contracting Officer issued a Final Decision refusing to approve SCI's delay claims. A copy of this decision is attached hereto as exhibit B and incorporated by reference.

17. SCI is entitled to a remission of the liquidated damages, payment of its full contract balance, payment of its costs for delay, impact and disruption, and such other monies and relief as this Honorable Court may deem appropriate.

**Requests for Relief**

WHEREFORE, Plaintiff, Structural Concepts, Inc. demands judgment of and from the United States as follows:

a. Payment of its contract balance in the approximate amount of $56,200.

b. Payment of its claims for additional compensation in the approximate amount of $1.2 million;

c. Remission of all Liquidated Damages imposed on the project by the Air Force;

d. Interest pursuant to 42 U.S.C. § 611 at a rate established by the Secretary of the Treasury pursuant to Public Law 92-41.

e. All attorney's fees and costs incurred by SCI in this case; and

f. Such other relief as this Court deems just and proper.

POWELL, TRACHTMAN, LOGAN, CARRLE
& LOMBARDO, P.C.

By: Kelly H. Decker
David W. Francis
Kelly H. Decker
114 North Second St.
Harrisburg, PA 17101
(717) 238-9300
(717) 238-9325

Date: July 7, 2004

DEPARTMENT OF THE AIR FORCE
305th Contracting Squadron (AMC)
McGuire AFB, NJ 08641

SCI
MAR 2 2 2004
Received

**SENT VIA FAX AND CERTIFIED MAIL RECEIPT NO. 7001 2510 0008 8048 4376**

19 March 2004

305 CONS/LGCB (Carlen Capenos)
2402 Vandenberg Avenue
McGuire AFB, NJ 08641

Structural Concepts, Inc.
1305 S. Roller Road
Ocean NJ 07712

Contracting Officer's Final Decision and Demand for Payment: F28609-99-C-0005, Assertion of Liquidated Damages, $776,448.00

1. The Government is asserting its rights to assess Liquidated Damages on the above contract. This contract incorporates FAR Clause 52.211-12 Liquidated Damages—Construction (Apr 1984) with the sum of $2,022.00 for each day of delay.

2. The completion date on this contract was 19 December 2002 per modification 15 dated 8 July 2003. The contract was completed 7 January 2004.

3. While beneficial occupancy was taken on 15 September 2003, this does not constitute Government acceptance, implied or otherwise. The building was not complete and capable of serving its intended purpose as Visiting Quarters until 7 January 2004. Heating in the facility was not completed until late November or early December 2003 and the cable was not installed until 7 January 2004.

4. Liquidated damages are assessed from 20 December 2003 through 7 January 2004, a period of 384 days.

December 20-31, 2002 = 12 days
January 1-31, 2003 = 31 days
February 1-28, 2003 = 28 days
March 1-31, 2003 = 31 days
April 1-30, 2003 = 30 days
May 1-31, 2003 = 31 days
June 1-30, 2003 = 30 days
July 1-31, 2003 = 31 days
August 1-31, 2003 = 31 days
September 1-30, 2003 = 30 days
October 1-31, 2003 = 31 days
November 1-30, 2003 = 30 days
December 1-31, 2003 = 31 days
January 1-7, 2004 = 7 days

Total = 384 days X $2,022.00 per day = $776,448.00

5. Pursuant to FAR Part 32.610, Demand for Payment of Contract Debt, I have determined the sum of $776,448.00 to be due the Government for Liquidated Damages.

EXHIBIT
tabbies
A

6. Please be notified that any amounts not paid within 30 days from the date of this letter will bear interest from that date. The interest rate shall be the rate established by the Secretary of the Treasury, for the period affected, under Public Law 92-41.

7. Payment shall be made by check drawn payable to the "Treasury of the United States," with the Contract Number entered on the memo line of the check. The check shall be forwarded to the following address:

   DFAS-BKRD/CC
   P.O. Box 955515
   St. Louis, MO 63195-5515

8. You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed.

9. This is the final decision of the Contracting Officer. Your company has the right to appeal such decision under the Disputes clause. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals at:

   Recorder, Armed Services Board of Contract Appeals
   Skyline Six
   5109 Leesburg Pike, 7th Floor
   Falls Church, VA 22041

   and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals of the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

10. If you have any questions regarding the above, please contact Carlen Capenos at 609-754-5935 or via email at carlen.capenos@mcguire.af.mil.

EDWARD J. BAKER
Contracting Officer

cc: Safeco Insurance Company

SCI
JUN 28 2004
Received

**DEPARTMENT OF THE AIR FORCE**
305TH CONTRACTING SQUADRON (AMC)

305 CONS/LGCB (Carlen Capenos)
2402 Vandenburg Avenue
McGuire AFB, NJ 08641

25 June 2004

Structural Concepts, Inc.
1305 S. Roller Road
Ocean NJ 07712

Dear Mr. Moutis:

Reference is made to Contract No. F28609-99-C-0005, Repairs VOQ Building 2704, McGuire Air Force Base, New Jersey. Further reference is made to your certified claim of 20 January 2004. In accordance with the requirements of the Contract Disputed Act, this document is my final decision as Contracting Officer. For the reasons which follow, your claim has been denied in its entirety.

**Subject: CONTRACTING OFFICER'S FINAL DECISION**

**CLAIM BY:** Structural Concepts Inc. ("SCI")

**TYPE OF CLAIMS:** Alleged contractor delay costs; alleged costs for work items that were not part of the original scope of the contract; alleged subcontractor delay costs

**CONTRACT NUMBER:** F28609-99-C-0005

**DATE CLAIM RECEIVED:** Certified, sum certain claim received on 2 February 2004 (original 14 January 2004 submission contained a defective certification)

**DESCRIPTION OF SERVICES:** Repair/Renovate Visiting Officers Quarters, Bldg 2704, McGuire AFB

**NAME OF CONTRACTING OFFICE:** 305th Contracting Squadron
2402 Vandenberg Avenue
McGuire AFB NJ 08641-1712

**DESCRIPTION OF CLAIMS:** As stated in SCI's claim dated 28 December 2003 (received 2 February 2004), the claim contains three parts:

1) $928,690.51 for alleged delay days;
   a. Delay A: $394,984.66 for 462 days – 10 Aug 1999 to 25 Oct 2001
   b. Delay B: $111,956.70 for 69 days – 26 Oct 2001 to 3 Jan 2002
   c. Delay C: $421,749.15 for 550 days – 2 January 2002 to 1 Aug 2003

2) $92,006.13 for alleged work items that were not part of the original scope of the contract
   a. Temporary Heat: $11,345.00
   b. Demolition Work: $59,813.54
   c. Wallpaper Priming: $12,069.97
   d. Gypsum Board Repairs: $7,682.68
   e. Relief Valve Repair: $1,094.94

3) $212,862.16 for alleged subcontractor delays
   a. Pramukh Aluminum & Glass Co.: $18,654.13

EXHIBIT
B

b. B&G Elevator: $9,641.51
c. JS Mechanical Inc: $129,508.56
d. R and L Mechanical: $55,057.96

Total: $1,233,558.80

**STATEMENT OF FACTS AND CONTRACTING OFFICER'S DECISION:**

**Claim No. 1 (Alleged Delay Costs):**

This portion of the claim is denied. Based on the information provided by SCI in its claim, the Government has been unable to substantiate that any compensable delays occurred. SCI has not shown there were any periods of sole Government-responsible delays. Additionally, the Government recognizes delays did exist which were caused by SCI. Structural must show, among other things, it was substantially delayed by the Government and there were no contractor delays. In your certified claim, SCI merely asserts that the Government caused SCI to experience compensable delays; SCI has not offered proof to establish Government responsibility for delays.

The Government notified SCI during a fact finding meeting on 5 May 2004 that a detailed delay analysis was needed for the government to understand how the delay periods indicated were actual delays. SCI informed the Government that no analysis would be completed as the days were so simple and plainly put forth in the claim an analysis was not necessary. However, as SCI's claim does not provide a delay analysis, there is a failure of proof and without proof, the government is not in a position to pay this delay claim.

I note the following facts related to these delay claims:

The contract was originally issued with a period of performance of 360 days. Modification P0001 extended the contract to 13 Jan 01 (411 days from date of award or 197 from notice to proceed); P0003 added 286 days; P0009 added 351 days; P0010 added 47 days; P0012 added 5 days; and, P0014/15 added 16 days for a total of 1,480 days. The actual days to complete the project were 1,651 days (30 Jun 1999 to 7 Jan 2004).

Next, through the contract modifications, SCI has been compensated for its direct field expenses. Finally, no substantiation has been submitted to verify any of the numbers on SCI's Excel spreadsheet. The Government auditors could not substantiate all of the alleged expenses.

Each of the three periods of alleged delays are discussed individually below.

a. **Delay A: $394,984.66 for 462 days – 10 Aug 1999 to 25 Oct 2001:** The Government's calculations for the inclusive dates of 10 Aug 1999 to 25 Oct 2001 are 817 days. During a fact finding meeting held on 5 May 2004, George Moutis stated it should have been 25 Oct *2000*, not 2001. This changes the alleged delay days to 452 days.

   The claim states the alleged delay is a result of Government failure to attain the necessary funds to repair termite damage identified in Modification P0003. P0003 was issued on 21 Sep 2000. It incorporated Addendums 1, 2, 3, and 6 into the contract. Addendum 6 addressed the termite damage and was for $159,012.32. According to the documentation in the contract file, SCI requested 180 additional days for this termite issue and SCI was granted 180 additional days. (Note: SCI also requested 70 days for Addendum 3, 21 days for Addendum 2 and 150 days for Addendum 1. All parties agreed to 28 days for Addendum 1, therefore, SCI's total requested days were 299 additional days.) This modification added 286 days to the period of performance.

   The termite damage issue was first identified to the Government in RFI #2, received 23 Aug 1999. According to RFI #6, dated 1 Sep 99, SCI claimed to be on schedule. The government cannot determine why the start date of the alleged delay is 10 Aug 99. Additionally, funding was added 21 Sep 2000 and the date of completion was extended to 26 Oct 2001.

During this period, a suspension of work was issued 22 February 2000. This suspension of work was rescinded with P0001 on 10 Apr 2000. This was a period of 47 days. The government cannot ascertain how the alleged lack of funding impacted SCI's schedule. The government cannot substantiate entitlement to this portion of SCI's delay claim. Therefore this portion of the claim is denied.

**Delay B: $111,956.70 for 69 days – 26 Oct 2001 to 3 Jan 2002:** SCI alleges 69 days of delay as a result of Government failure to obtain funding. SCI's claim does not indicate what funding was not available. When asked to explain the basis for this part of the claim, George Moutis stated that item E in modification P0004 entitles SCI to a delay. Item E stated, "Period of Performance adjustment and any cost associated thereto of the contract are to be negotiated at a later time." In spite of this language, SCI must demonstrate that it is entitled to receive additional money to compensate it for time associated with performing additional work. The mere assertion of a delay of 69 days without more fails to establish entitlement.

b. **Delay C: $421,749.15 for 550 days – 2 January 2002 to 1 Aug 2003.** The government's calculations for the inclusive dates of 2 Jan 2002 to 1 Aug 2003 are 576 days, not 550 days. Additionally, Delay B included 2 & 3 Jan 2002 as delay days, so starting this delay period on 2 Jan 2002 would count those two days twice.

The difference between the 550 and the 576 days was addressed during the fact-finding discussions held on 5 May 2004. George Moutis stated the difference of 26 days was due to his delay on subcontracting with a new electrician after his original subcontractor died. He also said that from 1 Aug 2003 to 15 Sep 2003, SCI was experiencing a concurrent delay, but he did not explain the concurrent delay.

During this alleged period of delay, a Suspension of Work was issued on 31 January 2002. Modification P0006 would have rescinded it on 13 May 2002. However, as Mr. Moutis refused to sign it, it was rescinded unilaterally on 29 May 2002 with the issuance of Modification P0009. This is a period of 118 days. Once the Suspension of Work was rescinded, SCI refused to return to work. SCI did not return to the work site until 2 Sep 2002. The Government did nothing to prevent SCI from returning to work and in fact, pleaded with SCI to return to work. The fact that SCI did not return to work immediately upon the lifting of the work suspension establishes that SCI was not on "idle-standby" – a condition precedent to establishing delay compensation entitlement. In fact, the suspension itself stated a rather long remobilization period would be granted upon termination of the suspension – thereby eliminating potential "idle-standby". The period of time that SCI refused to return to work was 96 days.

The Government has determined two Contractor-responsible delays during this 2 Jan 2002 to 1 Aug 2003 period. The first was when SCI refused to return to work after the 31 Jan 02 Suspension of Work was rescinded (29 May 2002 to 2 Sep 2002). The second was when SCI walked off of the job from 28 Nov 02 until 24 Jan 2003. Both of these delays are contractor-caused delays.

A letter dated 28 Nov 2002 submitted by SCI stated it would cease working until the government issued a contracting officer final decision regarding the status of the contract. I remind you of FAR 52.233-1 (j), "Disputes (Oct 1995)"; which in part states, "The Contractor shall proceed diligently with performance of this contract pending final resolution of any request for relief, claim, appeal or action arising under the contract and comply with the decision of the Contracting Officer." SCI did not abide by this when it walked off of the job from 28 Nov 2002 to 24 Jan 2003 (57 days). At the time our decision was made to reimburse SCI for its cost, the Government thought that was the only way to be fair to SCI. To the contrary, SCI wanted the contract to continue as a firm-fixed-priced contract. This is what SCI wanted prior to its return to work. The Government issued a decision it would disregard its previous decision which converted the contract to a reimbursement contract. Finally, as the Government cannot ascertain how the alleged lack of funding or the temporary change in contract status impacted SCI's schedule, the government cannot substantiate this delay claim. Therefore this portion of the claim is denied.

**Claim No. 2 (Alleged cost for work performed that was not part of the original contract scope.):** This portion of the claim is denied. Each item is discussed individually below. However, the following two statements pertain to all items in Claim No.2

a. This claim is after the fact and SCI should provide exact costs and proof of the additional expenses. The claim only provided estimate sheets for SCI's estimated costs. DCAA was asked to verify these estimated costs and was unable to do so as SCI could not furnish substantiation to them.

b. In the fact finding meeting held on 5 May 04 in regards to this claim, SCI was asked if it had any further information regarding these issues that should be taken under advisement prior to issuance of the decision. George Moutis replied "No."

In addition to the above statements, my reasoning for denial of each is as follows:

a. **Temporary Heat: $11,345.00**. This item was previously submitted as a Request for Equitable Adjustment (REA) in a letter dated 13 Dec 00. The request was for an adjustment of $22,670.79. In a letter dated 4 Jan 01, Linda Williams, Contracting Officer, denied the REA stating:

"The Government has reviewed your original project schedule. It shows interior finishes (drywall) commencing late October 1999 and completing sometime in March 2000. The HVAC piping and ductwork also shows being installed concurrently during this period. Obviously, you intended to provide heat to the building during that period by other means than the HVAC to complete the interior finishes. Therefore, no additional cost has accrued to you due to the delay in the project."

Secondly, in a letter dated 29 Jan 01, Linda Williams stated:

"The denial of your request for an equitable adjustment for temporary heat is correct. The fact that the existing electric may not be sufficient for your needs is not the responsibility or obligation owed to you by the Government. The Government made no representation as to the electrical capacity of the building and is in no way responsible for the electricity being insufficient for your use. No additional cost has been accrued by you due to the delay in the project, the additional cost was accrued because you failed to verify the capacity of the electricity prior to bidding the project."

The original determinations of Contracting Officer, Linda Williams, stand. This portion of the claim is denied.

b. **Demolition Work: $59,813.54.** This item was previously submitted as a Request for Equitable in a letter dated December 2000 with Construction Cost Estimates dated 30 Nov 00. The request had three parts and each is discussed below.

1. **$1,511.78 for RFI #1, Demolition of Wall & Doors**: You were compensated for this expense in modification P0004 under Addendum 8. You were paid the negotiated agreed amount of $1,306.36 for the demolition of extra walls and doors. This part is denied as you have already been paid.

2. **$54,220.77 for RFI #3, 4, 6, Demolition of A/C Units & Pipings**: In a letter dated 29 Jan 01, this was denied by Linda Williams. She stated:

"Regarding your RFI 0003 and 0006, this office has consulted our legal department and the original decision on this matter stands. The Government believes that the demolition of the piping and A/C units is covered by General Note #8 on drawing A-4 and also diamond box number 5 on drawing A-4. You must also read the project as a whole and look at the installation drawings, which clearly show new piping and A/C units. The fact neither you nor any other contractor at the time of the solicitation raised this question or sought clarification is further indication a reading of the drawings and specifications as a whole removes any questions or need for clarification."

The original determination of Contracting Officer, Linda Williams, stands. This part of the claim is denied.

3. **$4,080.99 for RFI #8, Demolition of Extra Concrete @ West Vestibule:** SCI was compensated for this expense in modification P0004 under Addendum 8. SCI was paid the negotiated amount of

$3,846.96 for the demolition of extra concrete at the west vestibule. Since SCI has been paid, this part of the claim is denied.

c. **Wallpaper Priming: $12,069.97:** This item was submitted previously as a Request for Additional Funds in a letter dated 8 October 2002. In Government letter dated 30 October 2002, your request was denied. The letter stated:

> "Specifically, primer is required per Division 9, Section 09951, Wall Coverings, para 1.2. B. It states, "Prime coats for substrates are specified in Division 9 Section 09900 "Painting." Referencing that section, para 2.3. Primers, its states to "Provide the manufacturer's recommended factory –formulated primers that are compatible with the substrate and finished coats indicated." You indicated the manufacturer's recommendation is Professional TEKNA primer.
>
> Additionally, Division 9 Section 09951, Wall Coverings, para 3.1. B requires the contractor to follow manufacturer's printed instructions for surface preparation. According to your letter dated 8 Oct 2002, the manufacturer's recommendations are "On new drywall, if future stripping is desired and no primer is specified, used Professional heavy duty clear strippable adhesive. If primer is specified, used Professional TEKNA primer and then Korseal Adhesive."
>
> Therefore, because the Government requires Primer per the above paragraph, there is no additional work requiring additional funds."

This item was again submitted as a REA in a letter from you dated 27 January 2003 for the same amount. This second request was due to your claim of additional cost during the period when the contract was a cost reimbursement type contract. This second REA was denied in a letter dated 18 March 2003 because the wallpaper priming was a requirement of the contract and not additional work whether the contract was a cost reimbursable contract or a firm-fixed-price contract.

This item also had the specific appeal language that gave you the right to appeal this Contracting Officer's Final Decision. Your appeal period expired on 24 March 2004. Therefore this item is denied.

d. **Gypsum Board Repairs: $7,682.68:** SCI has provided a cost estimate in its claim on this issue and a fax cover sheet dated 8 October 2002 stating "I informed you that during the suspension period the building was not climate controlled and in fact was realized when Jeff Mullins and I met with Sgt Carter to review the termite damage on that date the building was over 100 degrees, for this reason a lot of the gypboard joints have shrunk therefore requiring repairs." However, you also provided the Government with a fax on 18 October 2002 from yourself that references the above walk through where you state, "We walked the entire building no noticeable damage other than some hair line wall cracks.

The Government originally denied your request for additional funds on 1 November 2002. This denial letter stated, among other things, the following:

> "On 16 July 2002, you had an on-site visit to inspect the facility. During this inspection you felt one seam with your hand. When asked what you were doing, you said checking the seam. At this point, you did not indicate any damage had occurred…On 28 August, you had another on-site visit to inspect the facility…during this walk through, no indication was made that there was significant damage to the joints…On 14 February 2002, you submitted an AF Form 3065, Contract Progress Report. For interior sheetrock, you indicated that during that period, you completed .700% of that line item for a total of 1.950% of 2.000%. John Scirrotto changed this to .350% and state, "there is spackling, sanding, and touching up to be done throughout." This indicated to me there was a significant amount of work to be completed as of 14 February 2002.
>
> Additionally, the fact you proceeded with the work before notifying Contracting, we cannot verify the damage you are claiming. Carlen Capenos, the Contract Administrator, received a fax from you on 8 October 2002 with your request for funds. According to your invoice submitted by your drywall

subcontractor, completion work had commenced on 3, 4, and 7 October 2002. Given claimed damage cannot be substantiated, again, your request is denied."

The letter continued by stating, "When the COTR spoke with your spackler, he indicated damage was being caused by not letting the spackling fully dry before putting on the primer."

You also submitted a second REA for this item in a letter dated 27 January 2003 in the amount of $11,798.03. This second request you said was due to your claim of additional cost during a period when the contract was a cost reimbursement type contract. The Government in a letter dated 18 March 2003 because the repair work for the gypboard was not additional work whether the contract was a Cost Reimbursable or a Firm-Fixed-Price Contract denied this.

This item also had the specific appeal language that gave you the right to appeal this Contracting Officer's Final Decision. Your appeal period expired on 24 March 2004. Therefore this item is denied.

e. **Relief Valve Repair: $1,094.94:** The Government originally denied your request for additional funds on 1 November 2002. Your request for a change order was denied based on the following:

If any issues arise in the repair or replacement of any contractually installed equipment that fail before the facility has been turned over to the Government, it is maintained and/or replaced by the contractor until accepted by the Government. The relief valve and working pump are a requirement of the contract. The Government has always required a working unit and has not changed this requirement.

Specifically, regarding your claim the pressure relief valve failed due to over pressurization, the Government disagrees. When a High-Temp-Hot-Water line breaks somewhere along the main line it will cause a depressurization to any building being fed from that loop, not an over pressurization. It is our position the problem with the pressure happened when SCI switched over from winter mode to summer mode. This is what caused the pressure relief valve to blow, what it is designed to do. The problem arose once the excessive pressure was back to normal levels and the relief valve didn't reseat itself. Since the valve continued to leak and would not reseat itself, then it became a manufacturer's defect or contractor's problem, not a change to the original scope of work.

The coupling that broke which connects the pump and motor together was not broken due to over pressurization. There are basically two reasons a rubber coupling breaks. The first happens when a pump impeller becomes lodged with some foreign object causing the coupling to break under excessive torque coming from the motor shaft. The second is improper alignment of the pump and motor shafts. This causes the coupling to break apart into pieces, which is what happened.

The Government feels both issues are due to manufacturer's defect and/or improper installation. SCI's allegation the Government requested SCI to maintain heat is not indicated in any of the Government's documentation. Additionally, when a contractor has a renovation project of an entire building, it is up to the contractor to ensure certain temperature parameters to allow for proper installation of all finishes required per drawings and specs in the contract. Therefore, at some point throughout the life of the contract they would eventually require heat in the building so that they can do their job properly.

This item also had the specific appeal language that gave you the right to appeal this Contracting Officer's Final Decision. Your appeal rights are contained in the contracting officer's final decision.

**Claim No. 3 (Alleged subcontractor delays):**

a. Pramukh Aluminum & Glass Co.: $18,654.13
b. B&G Elevator: $9,641.51
c. JS Mechanical Inc. $129,508.56
d. R and L Mechanical: $55,057.96

This portion of the claim is denied. We reiterate the following from Claim No. 1 above.

Claim No. 3 is nothing more than a mere allegation of entitlement without substantiation. SCI's unsubstantiated subcontractor delays claim does not provide information from which to evaluate entitlement.

Because you have not provided any documentation to support these portions of your claim, thus not satisfying the entitlement establishment requirement, each of these subcontractor claims is denied.

**APPEAL RIGHTS:**

This is the final decision of the Contracting Officer, **that your entire claim is denied**. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number. With regard to appeals to the agency board of contract appeals, you may solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision. The mailing address for the ASBCA is: Armed Services Board of Contract Appeals, Skyline Six 7th Floor, 5109 Leesburg Pike, Falls Church VA 22041-3208.

EDWARD J. BAKER
Contracting Officer
25 Jun 2004