THOMAS J. HIRSCH, ESQ.
1001 Deal Road
Ocean, NJ 07712
(732) 493-3700
Attorney for Plaintiff

| | | |
|---|---|---|
| STRUCTURAL CONCEPTS, INC. | : | UNITED STATES COURT OF FEDERAL CLAIMS |
| | : | |
| Plaintiff | : | Civil Action NO. 04-1141 C |
| -VS- | : | |
| | : | |
| THE UNITED STATES | : | |
| | : | |
| Defendant | : | |
| | : | |

## BRIEF ON BEHALF OF PLAINTIFF, STRUCTURAL CONCEPTS, INC.

## THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED

THOMAS J. HIRSCH, ESQ., attorney for plaintiff
1001 Deal Road
Ocean NJ 07712

## PRELIMINARY STATEMENT

Plaintiff seeks a partial summary judgment dismissing the government's claim for liquidated damages in the amount of $776,448. (Ex 1) The contracting officer, Edward Baker, issued two final contracting officer's decisions addressing plaintiff's claim for equitable adjustment and the government's claim for liquidated damages. The contracting officer's final decision on plaintiff's claim for equitable adjustment is dated June 25, 2004 (Ex.44). That decision dismissed plaintiff's claim for an equitable adjustment in its entirety. The contracting officer specifically found that plaintiff had failed to establish any government-caused delays on the project. The contracting officer's final decision dealing with the government's claim for liquidated damages is dated March 19, 2004 (Ex.45). The contracting officer found that the initial 360-day term of the contract, which was to expire on June 28, 2000, had been extended by various contract modifications to December 19, 2002. The contracting officer's final decision then concludes that substantial completion was achieved on September 15, 2003 and, therefore, plaintiff was responsible for 384 days of liquidated damages totaling $776,448.

The motion record establishes that the government acknowledged throughout the course of the project, and most recently in its own expert's report, that it was responsible for over two years of delay and that a combination of government-caused delays and excusable delays lasted for a period of 2-1/2 years. Despite the overwhelming evidence to this fact and the documentation of the government's admission that it caused the delays being presented to the contracting officer during his deposition, he either took the position he was not aware of the documents or he ignored the

1

admissions and clung to his opinion that plaintiff had not established any government-caused delays.

The government's expert in this case, Stewart Ockman, issued a report and was deposed.  Mr. Ockman concludes that the various modifications issued during the term of the contract extended the completion date of the contract 908 days beyond the 360-day contract period.  He then opines that substantial completion occurred 1,178 calendar days later than planned.  Of the 1,178 days, Mr. Ockman concludes that 830 calendar days are compensable to SCI and an additional 78 calendar days are excusable and the remaining 270 calendar days "are to SCI's account due to its slow progress in achieving substantial completion."  Plaintiff's expert, Julian Toneatto, agrees with the number of days that the contract was extended pursuant to the actual modifications that were issued, i.e. 908 days, however, he arrives at a different date as to when substantial completion occurred and a different number of days that are compensable to the contractor.  The government's expert opines that substantial completion occurred on September 15, 2003 whereas Mr. Toneatto opines it occurred on August 8, 2003.  Pursuant to the last unilateral modification issued by the government, the contract completion date was December 19, 2002.  However, the motion record clearly establishes that the government had agreed to further extensions to the contract and a completion date of at least May 2, 2003, even though that was never reduced to a formal modification of the contract.

Mr. Ockman stated in his deposition that he looked for any government-caused delays that occurred between the contract completion date established by the last modification, i.e. December 19, 2002, and the date of substantial completion, i.e. September 15, 2003, however, was unable to find any.  He

2

states that, "Obviously, to the extent that any are identified, SCI is entitled to additional time and additional money if it's a government delay on the critical path." (Ex.37, T78:10-23)

The motion record establishes that there were two major causes of government-caused delays which affected the completion of the contract between December 19, 2002 and September 15, 2003. The first cause relates to the government's improper attempt to unilaterally change the contract from a firm fixed price contract, the basis on which the contract was initially bid and awarded, to a "cost plus" or "reimbursable" contract. The government's initial decision to make this change was motivated by its belief that it was going to incur a very substantial delay claim by the contractor and, therefore, the government believed by changing the contract to a cost plus, they could mitigate the amount of damages the government would have to pay to the plaintiff. Initially, it was the government's strategy to withhold their decision to change the contract to a cost plus from the contractor, however, ultimately, the government, due to pressure by certain government employees that it was the ethical thing to do, advised the contractor of this change. This attempt to change the contract was initiated after the initial one-year term of the contract had long expired, then continued throughout the performance of the contract until January 2003 when the contracting officer, at the insistence of plaintiff, issued a final contracting officer's decision that the contract was a firm fixed price contract. However, the government's flip-flopping as to the type of contract resulted in very substantial delays in plaintiff receiving payments. The flip-flopping as to the type of contract, in fact, delayed for several months the contractor's ability to even submit invoices because he was required to submit a different form of

3

invoice for a cost plus contract as opposed to a firm fixed price.   However, it took months for the government to supply the appropriate forms of invoices that the contractor had been requesting so he could submit his invoices. When the contractor finally received the right form of invoice from the government, he then submitted invoice #29 on October 21, 2002 and invoice #30 on November 5, 2002 totaling $167,912.53.   However, the government failed to pay those invoices until March 15, 2003 and March 28, 2003 respectively.

As a result of not receiving these payments, the contractor initially advised the government that, because of the financial hardship being caused by the government's failure and refusal to pay invoices, SCI was going to cease working on the project on November 8, 2002.   Based on the government's promise to immediately pay invoices 29 and 30, SCI did not cease working; however, payment was not forthcoming.   The government's failure to make payments to the contractor exacerbated the financial hardships that SCI was already incurring because of the government's unilateral delays in issuing and funding modifications for additional project costs.

Therefore, on November 26, 2002 the contractor advised the government he would cease work on November 27, 2002.   The government still failed to make payment and SCI ceased work on November 27, 2002 and did not return until January 24, 2003.   SCI's return to work was premised on an agreement with the government that contract payments would be brought current and the contract completion date would be extended.   The government's failure to make substantial payments to a contractor, as required by the terms of the contract, constitutes a breach of contract that justifies the contractor in either terminating the contract or suspending work on the project until he receives payment.

It was Mr. Ockman's opinion that whether or not the contractor received payment was irrelevant and, therefore, he did not bother to analyze any payment request by the contractor or when payments were received. He believed that a contractor was required to work even if he was not paid by the government.

The government acknowledged in its own internal memorandum that, "for all effects and purposes, we caused [SCI] to walk off the job ***" and that its claim for liquidated damages was "toothless" and nothing more than a "bluff". (Ex 33)

The second government-caused delay between December 19, 2002 and September 15, 2003 was the discovery of holes in the fan coil units. The holes were the result of the pipes freezing because of the government's failure to purge the pipes when it shut down the heat on the base during a period when temperatures were well below freezing. It is uncontested that plaintiff notified the government with an urgent memo that any shutdown of the steam heat system at the end of January would cause pipes and materials to freeze and, therefore, plaintiff would not take responsibility for any such damage that occurred. Despite this, the government shut off the heat for a period and, in fact, the pipes froze causing the damage to the fan coil units.

The damage, however, was not discovered until May 8, 2003 by plaintiff's mechanical subcontractor. Plaintiff then took every step possible to mitigate delays by obtaining pricing from the manufacturer of the replacement parts and forwarding same to the contracting officer. However, plaintiff put the government on notice that their work would require

additional time be added to the contract which would not be known until the price was received and availability of the parts was known.

Typical of the problems associated with delays in issuing modifications and obtaining funding throughout the project, SCI received the proposed bilateral modification to perform the additional work on July 10, 2003.  SCI submitted its proposal to perform the additional work on May 15, 2003, but the government did not accept the proposal until July 10, 2003. However, in order to mitigate project delays, and with the agreement of the government, plaintiff started the coil replacement work prior to the modification being issued.  Plaintiff relied on the representations by the government that funds were on-base and the modification was within days of being executed. However, several weeks after commencing work the modification had still not been issued, therefore, plaintiff's mechanical subcontractor ceased performing any additional work on the coil replacement until he was assured there was a modification and that he would be paid.

SCI refused to sign the bilateral modification for the fan coil work because it only include a time extension for 16 days and did not include any time extension for the two month delay in issuing the modification. Additionally, the modification failed to include the contract completion date of June 14, 2003 that had previously been agreed to and set forth and established a contract completion date of December 19, 2002.

The government finally issued unilateral modification 00015 on August 28, 2003 which was received by plaintiff on September 5, 2003.  In order to mitigate delays, SCI had its mechanical subcontractor return to complete the project prior to receiving the unilateral modification and that installation was completed September 3, 2003. The balancing of the units was completed on

6

September 6, 2003.  It is plaintiff's position that the discovery of the damage to the fan coil units, which was admittedly the fault of the government and the delays in issuing the modification and obtaining funding for the work, despite the contractor's good faith efforts to mitigate delays, resulted in additional delays which, at the very least, are concurrent delays preventing the award of liquidated damages during the period involved with the fan coil replacement work.

In conclusion, plaintiff believes that the motion record establishes by uncontested facts, that the government is not entitled to any liquidated damages.  Contrary to the contracting officer's decision that substantial completion occurred on January 7, 2004, and interpreting the contested facts most favorably to the government, the date on which substantial completion was achieved was no later than September 15, 2003.  Based on the government's expert report and deposition testimony, substantial completion occurred 1,178 days beyond the 360-day contract period.  The delay alleged to be caused by the contractor is between the period December 19, 2002 to September 15, 2003, i.e. 270 days.  However, the government's breach of contract by failure to make contract payments, its improper attempt to change the contract from a fixed price to a cost plus, and the discovery of the damaged fan coil units and subsequent delay in issuing and funding the modification for the work, constitute government caused delays or, at the very least, concurrent delays during the aforesaid 270-day delay period.

<u>POINT I</u>

<u>SCI WAS JUSTIFIED IN SUSPENDING CONTRACT WORK BETWEEN NOVMEBER 28, 2002
AND JANUARY 24, 2003 BECAUSE OF THE GOVERNMENT'S FAILURE TO MAKE
TIMELY CONTRACT PAYMENTS TO SCI AND SCI WAS ENTITLED TO HAVE THE
CONTRACT TERM EXTENDED FOR A PERIOD EQUIVALENT TO THE AFORESAID
SUSPENSION PLUS A REMOBILIZATION PERIOD</u>

Both the contracting officer's final decision and the report of the government's expert, Stewart Ockman, establish December 19, 2002 as the contract completion date.  That date was established by virtue of contract modification 000015 that was issued on August 28, 2003, which modification was unilaterally issued by the government over the objection of SCI.  As noted, the contracting officer's final decision as to SCI's claim for equitable adjustment, concluded that SCI failed to establish any government-caused delays.  (Ex.43)  Mr. Ockman's expert report concluded that substantial completion occurred on September 15, 2003, and that between December 19, 2002 and September 15, 2003, he was not able to identify any government-caused delays.  However, he stated in his deposition testimony, "Obviously, to the extent that any are identified, SCI is entitled to additional time and additional money if it's a government delay on the critical path." (Ex.37, T78:10-23)  When asked if he was aware of any actual delays in the contractor receiving payments because of the change between cost plus and firm fixed price contracts, Mr. Ockman stated:  "I did not evaluate that."   (Ex.37, T88:20-25, T89:1-5).   In fact, Mr. Ockmkan acknowledged he did not analyze the contractor's invoices submitted to the government.  T86:24-25, T87:1-6.  Mr. Ockman was also asked whether he saw anything in the records he reviewed that indicated the lack of a decision by

the contracting officer as to the type of contract, which dictated the manner in which SCI would be paid, was affecting the contractor's ability to get paid. Mr. Ockman responded: "It may have. I don't specifically recollect." (Ex. 37 T85:3-12) Finally, Mr. Ockman was asked if the lack of a contracting officer's decision was affecting SCI's ability to get paid, would it have a significant impact on Mr. Ockman's expert analysis. His response was, if the contractor is "*** not getting paid, it does not give [the contractor] the right to walk off the job." (Ex.37. T85:13-24)

As the uncontested facts in this case demonstrate, from the outset the government was having problems funding the contract. From the start of the initial problem concerning asbestos removal and termite and water damage, the contractor was forced into prolonged delays and performing work despite the government not having the funds to pay for the work. SCI advised the government on many occasions that SCI was incurring financial hardship and this fact was acknowledged time and again by the contracting officer and other government employees as established in the Statement of Material Facts.

Because the government was aware of the very substantial delays it was causing the contractor and the contractor's right to bring a claim for an equitable adjustment related to those delays, the government sought to find a way to avoid or to drastically reduce the contractor's legitimate claims and came up with the fiction of changing the fixed price contract that was awarded to SCI into a cost plus or reimbursement contract. This is well documented in the Statement of Facts with letters and government memos supporting this improper attempt by the government to change the nature of the contract. The government's flip flopping on the type of contract initially delayed the contractor's submission of his invoices because the

format of the invoices had to be changed from a fixed price format to a cost plus format and he could not obtain the appropriate form of invoices from the government for several months.   Finally, when he did receive the appropriate form of invoices and submitted invoices for a cost plus payment in October and November of 2002, the government rejected the invoices and then requested they be submitted on a percentage of completion format.

By letter of May 29, 2002, the contracting officer advised SCI:

> "The number of delay days is immaterial on a cost plus contract.   You will not be compensated based on the Eichleay formula where days are of paramount importance.   You (and your subcontractors) will be compensated based on the actual cost expended on this project as verified by DCAA."

SCI then responded to the contracting officer's May 29, 2002 letter by its letter of June 24, 2002 (Ex.7).   In that letter SCI noted that the government's letter was now treating the contract as a "cost plus contract" and, therefore, the delays being encountered by SCI were irrelevant and would not have to be documented or proved because SCI was going to be paid for all of its costs on the contract.   SCI requested that the contracting officer provide legal authority to support the government's position that the contract was now a cost plus contract.

The government responded by its letter of June 27, 2002 (Ex.8) wherein the government noted that the government had agreed that SCI was not originally provided proper and timely notice of the award of the contract, however, in light of the fact that SCI was performing work under the contract, an "implied in fact" contract existed.   The letter went on to cite various case law involving implied in fact contracts, however, the letter never provided any authority justifying the government's change of the contract from a fixed price contract to a cost plus contract.

10

SCI responded by its letter of July 2, 2002 (Ex.9) again making inquiries of the government to support its position concerning the cost plus and why SCI should continue to work on the project without a promise by the government to reimburse SCI for additional expenses it had incurred related to various government delays.  Specifically, SCI noted the following:

> "It is my understanding that under cost-plus contracts, the contractor's (i.e., Structural) profit is not affected by the cost of performance because the Government must reimburse the contractor for all costs.  More important, if the costs of performance are higher than estimated, the contractor is not obligated to complete the work if the Government does not continue to furnish additional funds.

> Finally, we had to file a claim in order for the Government to agree on the additional costs that we would incur before starting this project, although the Government knew that we were right from the day we made the request for escalating costs back in early January of 1999.  It took the Government over two years to reimburse us for additional costs that we were incurring on a "daily basis".  Certainly, that is not the procedure dictated by a cost-plus contract because under such a contract the contractor is not obligated to finance its construction."

The reference in the last quoted paragraph to the claim for additional costs which was submitted in January 1999, referred to the increased cost incurred by SCI as a result of the government's failure to properly and timely notify SCI it had been awarded the contract.  This was referred to in the contracting officer's letter of June 27, 2002 (Ex.8).  SCI presented a claim at the outset of the contract in 1999 for the increased costs solely related to additional amounts SCI's subcontractors would now charge to do the work.  DCAA performed an audit and agreed that SCI was entitled to $345,455.  SCI first submitted the claim on January 22, 2001 and the audit was not completed until August 27, 2001.  The modification approving the payment was issued on April 15, 2002 and the payment actually received by SCI on May 1, 2002.  However, as noted in the above quoted language from SCI's letter of

July 2, 2002, SCI continued to work on the project despite not receiving those funds and paid the escalated cost to its subcontractors, which was creating a financial hardship on SCI.  That was the basis for SCI's concern about not being reimbursed for additional expenses it was incurring and the government's insistence that SCI keep working without those payments.

The government continued to take the position that the contract was now a "cost plus contract" also referred to a "reimbursable contract."  This can be seen in an interoffice email from Carlen Capanos dated August 28, 2002 (Ex.10) wherein she states in part

> "*** the overhead formula was moot after the contract switched to a reimbursable contract."

Prior to the May 29, 2002 letter, SCI had been submitting its invoices based on a firm fixed price contract format, in other words, based on a percentage of completion.  Based on the government's position that the contract was now a cost plus, SCI requested that the government supply the appropriate forms of invoices on or about July 2002.  However, the government did not actually supply the cost plus invoices to SCI until October 15, 2002 (Ex.15).  Upon receipt of the appropriate forms of invoices, SCI then submitted invoice #29 on October 21, 2002 in the amount of $101,945.12 (Ex.16).  On November 1, 2002 the government rejected invoice #29 and, despite providing no document or decision to SCI that the contract had changed from a cost plus back to a fixed price, directed SCI to submit the invoices on a "percentage completion basis."  (Ex.19)  The government's letter further indicated that it was having trouble discerning exactly what percentage of the project was completed based on the cost plus format.  However, if the government was having any problems, it was of its own making

in light of the fact that it was attempting to switch the nature of the contract and the billing process in the middle of the project.

SCI responded to the government's rejection of its invoice by its letter of November 5, 2002 (Ex.20). SCI noted therein that the invoice it had submitted had all the bills and payroll reports supporting the cost plus methodology as directed by the government. Therefore, SCI notified the government that it would cease work on the project on November 8, 2002 unless payment for invoice #29 was received. SCI notes that the contract provisions incorporated the Prompt Payment Act requiring payment within 14 days after submission of an invoice and that invoices be submitted every 30 days. Therefore, invoice #29 was required to be paid by November 4, 2002.

SCI then submitted invoice #30 in the amount of $65,912.53 on November 5, 2002, also using the cost plus format. That payment was required to be paid within 14 days, which would have been on November 19, 2002. By an email from Carlen Capanos to George Moutis of November 1, 2002 (Ex.31), Ms. Capanos advised that the government was "returning your invoice 29 with an explanation and a new procedure." That email also noted that the government was preparing a bilateral modification to change the contract completion date to January 28, 2003.

By letter of November 1, 2002, the contracting officer advised SCI that invoice 29 was being returned. That letter noted that after long and careful discussion concerning SCI's invoice, which the government acknowledged was prepared by SCI based on the advice the government provided to SCI, the government had concluded they could not distinguish between what had already been paid for or should have been paid for under the progress payments on the percentage of completion basis and, therefore, was taking the position, to

13

assure they would not overpay the contractor, that they would continue to pay the contractor based on the "percentage completed." The second paragraph of that letter indicates that SCI was going to be paid based on "the amount of work completed for the duration of this project."  However, it then noted that at the conclusion of the project the government will have a DCAA audit performed to determine the expenses SCI incurred.  The contracting office then concludes

> "Your final payment will be based on this audit with an allowance for reasonable profit and overhead."

Therefore, the government was now attempting to have in the contract both the elements of a fixed price and a cost plus.  The government was indicating that the progress payments would be based on percentage of completion but that the contract in essence would be a cost plus contract because at the end of the contract, there would be an audit to determine actual costs and then the government would provide an "allowance for reasonable profit and overhead" which apparently was to be arbitrarily determined by the government.

SCI responded to the contracting officer by its letter of November 5, 2002.  First of all, the letter responded to the contracting officer's concerns that somehow, based on that invoice, they could not determine whether the invoice included work and materials that may have been previously paid for on a percentage of completion basis.  The absurdity of that position was clearly pointed out in Mr. Moutis' November 5, 2002 letter (Ex.20).  The letter then noted that the government on May 29, 2002 had unilaterally declared the contract a cost plus contract.  SCI pointed out that they could not submit an invoice for payment until the government provided SCI with new payment forms which were not received until October 15, 2002.  SCI then noted

14

that the government's refusal to pay SCI's invoice #29 was a material breach of its contract with SCI.  SCI stated it was not obligated to finance the construction of the project.  Accordingly, SCI advised the government that if immediate payment was not received for invoice 29, SCI would not be able to proceed with the work on the project and would stop all further work on Friday, November 8, 2002.

SCI submitted invoice #30 in the amount of $65,712.53 on November 5, 2002.  That invoice was also submitted on the basis of the cost plus contract.

By the email from the contracting officer to Carlen Capanos on November 4, 2002 (Ex.50), the government recognized the dire situation SCI had found itself in by following the government's direction to submit invoices on a cost plus basis and the government's rejection of those invoices and demand that they be submitted on a percentage completion basis and now the refusal of the government to pay the invoices.  In that email the contracting officer notes SCI's dissatisfaction with the government's rejection of invoice 29, even though it was submitted based on the direction of the government.  The contracting officer notes in that email that he was advised by SCI that their invoice had been submitted to the government three weeks prior and SCI had promised its employees funds were forthcoming based on the government's directives.  It noted that SCI had advised the government that SCI did not have the money to complete the project.  Therefore, as the contracting officer notes, he told SCI to submit all correspondence in writing and it would be addressed.

Based on the promise of the contracting officer that invoices 29 and 30 would be paid immediately, SCI did not cease working on November 8, 2002 but

continued to work even though it had not been paid.  Despite the government's promise to make payments on the invoices and its contractual obligation to do so, as of November 26, 2002, the government had failed to make payments on invoices 29 and 30.  Therefore, by its letter of November 26, 2002 (Ex.18), SCI notified the government that SCI continued to be confused about the government's position as to the type of contract that existed between the government and SCI and, because of the lack of payment, SCI was going to cease working on the project and demanded the contracting officer's final decision on the type of contract and the associated performance and payment clauses governing it.

Due to the government's lack of payment, SCI, in fact, ceased working on the project on December 3, 2002 and did not return to work on the project until January 24, 2003.  SCI did not receive payment on its invoices #29 and 30 until March 15, 2003 and March 28, 2003 respectively.

Despite Mr. Ockman's opinion that the timely payment of SCI's invoices was irrelevant to his analysis of compensable delays suffered by SCI and delays caused by SCI, case law clearly supports SCI's position that it had a right to suspend work because of the government's failure to make timely payments.  In The Brooklyn and Queens Screen Mfg. Co., a corporation vs the United States, 97 Ct Cl. 532 (1942), the court upheld the contractor's right to terminate the contract based on the government's breach which was premised on the government's repeated failure to make timely payments of the contractor's periodic invoices.  The court citing Frank Pigeon v. the United States, 27 ct. Cl. 167 (1892) held, the contractor:

> "***had a right to assume from the inception of the work
> that he would be paid according to the requirement of the
> contract; and the failure of the Government to pay justified him
> in refusing to proceed ***.  Whatever might have been his fault

16

up to that time, the Government having permitted him to proceed, having accepted the performance of the contract during the month of September, and having received the benefit of his labor during this period, it was not in its power to withhold the pay in order that it might be secured against the consequences of a probable or possible failure." Id at 543.

In the foregoing case the court rejected the government's argument that the government was justified in withholding payment because of its concern about the contractor being behind schedule. In this case, the government doesn't even suggest a justification for the nonpayment of the contractor's invoices, rather the government simply failed to make payments without excuse or cause.

The government acknowledged that, "***for all effects and purposes [it] caused [SCI] to walk-off the job" (Ex.32); it further acknowledged that its claim for liquidated damages was essentially "toothless" and a "bluff" (Ex.33) and that "we [the government] are the bad guys on this one" (Ex.33) and that it had "bad acts" to atone for in the contract (Ex.34) and that it's unilateral decision to establish a completion date might hurt its chances in the litigation that the government assumed would follow the completion of the contract. (Ex.51)

Therefore, the government established a meeting with the contractor on January 17, 2003 in order to pave the way for the contractor to return to work and, in so doing, offered to extend the contract date to May 2, 2003 with an understanding that the government would not seek liquidated damages. (Ex.24) The government acknowledged, consistent with what Mr. Moutis has stated in his affidavit and supporting documents, that SCI could not agree to the May 2, 2003 date until it was able to verify with its subcontractors, who had demobilized, what their schedules would be for remobilization. (Exhibit 49) In furtherance of the agreement reached at the aforesaid January meeting,

17

the government sent a written agreement to SCI on January 17, 2003 (Ex.25). However, SCI had still not received payment on invoices 29 and 30. The government had provided to SCI a copy of how the government now wanted the invoices submitted on January 24, 2003. SCI resubmitted the invoices on February 25 and March 11, 2003. However, SCI did not receive payment on the invoices until March 15 and March 28, 2003. SCI signed and returned the agreement on April 1, 2003. However, consistent with what SCI had told the contracting officer's assistant, Carlen Capanos, SCI changed the contract completion date to June 15, 2003, which was premised on SCI's subcontractors' remobilization schedule. In its January 23, 2003 email, SCI advised the government that the remobilization was premised on the government making payments that were due. "As I informed you on Tuesday, JS Mechanical and Everlast Floors final commitment on re-mobilizing is based on payment. Without the resolution of payment there is additional delays that must be accounted for the completion deadline of the project currently set for 5/9/03." Pursuant to the agreement reached at the January 17, 2003 meeting (Ex.25), Mr. Moutis specifically advised Ms. Capanos about the June 15th date and she indicated to him he should put it into the agreement and that there appeared to be absolutely no issue about the government accepting the June 15th date as the contract completion date instead of the May 2, 2003. (Paragraph 58 of G.Moutis affidavit). At this point SCI believed it had an agreement with the government as to a completion date and the waiver of its liquidated damages. Consistent with the agreement, SCI had returned to work on January 24, 2003 and diligently pursued completion of the project (Ex.27).

In <u>Northern Helex Co. vs. The United States</u> 455 F.2d 546 (1972) the court also found the government to be in breach of contract for failure to

make timely payments.  However, in that case the contractor, while declaring a breach, continued to supply helium to the government, however, the court found that the contractor was justified in so doing.  In this case, plaintiff advised the government that plaintiff believed the government was in breach of contract, however, SCI never indicated it was terminating the contract but rather that it was going to cease working on the project until the government brought SCI's payments current and once and for all provided a contracting officer's final decision as to the nature of the contract between the government and SCI.

Northern Helex Co. addressed the circumstance of the plaintiff declaring a breach but yet continuing with the contract as follows:

> "As a general proposition, one side cannot continue after a material breach by the other, such as failure to pay and act as if the contract remains fully enforced (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court."  Id at 125-126.

While the court found a special set of qualifying facts in that case, the point is the court clearly recognized that "stopping performance would be fair and convenient" in the face of non-payment as would the declaration of a breach of contract.

In Blinne Contracting Co., 83, 83-1 BCA 1638, the Board, relying on Frank Pigeon v. the United States, 27 Ct. Cl 167 (1892) and Northern Helix v. U.S., Supra held that the government's consistent underpayments of the contractor's invoices constituted a breach of contract and justified the contractor abandoning the project.

The Board noted that while the contractor's performance was far from faultless in that its late start was inexcusable and progress was slow throughout, the government at least contributed to the contractor's problems

19

by underpayment, indecision and failure to provide a disposal area. In addition to the underpayments, the contracting officer also refused to assure the contractor that he would be paid for the work he might do in upcoming months and, therefore, the contractor refused to proceed with work and nothing further was done. The court sustained this action by the contractor noting that the failure to make a payment at the time specified is, in fact, a breach justifying abandonment.

In Building Maintenance Specialist, Inc. 83-2 BCA 16629 (1983), the Board analyzed a series of cases standing for the proposition that the government did not have a right to withhold any amount from the contractor's monthly unit prices based on a mere general charge of unacceptable work. The Board also relied on Pigeon v. United States, Supra and R.H.G. Corp., ASBCA No. 9922, 66-1BCA §5361. The Board noted that, even where the parties' contract did not indicate the progress payments would be the sole means of financing the work, as was the case in R.H.G. Corp., the holding in R.H.G. Corp. was nonetheless applicable because the contractor was a small business enterprise and clearly the failure to receive monthly payments frustrated and impeded his ability to perform the project. Once again, the court found that the failure to make contract payments as required by the contract constituted a breach of contract by the government.

In Ernest c. Whitbeck, Receiver of L-W-F Engineering Co., Inc. vs. the United States, 77 Ct. Cl 309 (1933) the court held that when the government fails to make progress payments in accordance with the contract, such failure constitutes a breach of the contract entitling the contractor to damages resulting therefrom, including loss of profits. The court specifically held that the plaintiff was justified in discontinuing work under the contract

20

when the percentage of work completed substantially outpaced the percentage of payments the government was making.

In Appeal of Whited Company, Inc., 84-3 BCA 17654 (1984), the Board reviewed the detailed chronological history of various problems encountered by the contractor on the project and the government's responses and determined that the government's termination of the contractor was improper. Similar to this case, the contractor had argued that the time to complete the contract could not be considered to have expired when the government was still actively issuing change orders. The Board noted,

> "It is well-established that a change order, issued after all previous time extensions have lapsed, should grant to the Contractor sufficient time to accomplish the additional work and be commensurate with the delay impact which the new work has on the remaining contract work." Citing Blackhawk Heating & Plumbing, Inc. VACAB No. 664, 72-2 BCA ¶9573; D&E Construction Co., VACAB No. 561, 67-2 BCA ¶6558.

The Board found that the basic reason for the termination was because the contractor abandoned the contract and announced that he was unable to continue. SCI acknowledges that the instant case does not deal with a government termination or, in fact, with SCI abandoning the project because of lack of payments and other issues but rather the right of SCI to suspend operations until such times as the government cured its breach by making the payments that were due and owing to SCI.

The Board noted that ordinarily a contractor has an obligation to continue performance of work regardless of the pendency of any disputes. However, the court also noted that, "the duty to proceed is not absolute." The Board specifically noted by example that, "such duty may not be imposed when the government materially breaches the contract. "The government's failure to make payments, which are clearly due, is such a breach." Citing

21

<u>Northern Helex Co. v. the United States</u>, Supra and <u>U.S. Service Corp</u>., ASBCA No. 8291, 1963 BCA ¶3703 and <u>H.E. & C.F. Blinne Contracting Co.Inc</u>., Supra. The court also cited the following holding in another Board case:

"Under circumstances similar to those in the instant case, another board has stated:

'In any other circumstance, appellant's letter of April 7, 1980, would have amounted to an anticipatory repudiation, giving the government an immediate right of default termination. Here, since appellant was privileged to suspend further performance until the government had cured its antecedent material breach, his statement that he would not resume contract services could not have discharged the government's duty to pay for the services it had already rendered. His statement that he would not further perform could not, therefore, give rise to a government claim for total breach, and was, by definition, not an anticipatory repudiation.'" <u>Restatement (2nd) of Contracts</u>, §243(1), 250(a) (1979); <u>Westinghouse</u> 437 F.Supp. at 1338-39 (<u>Drain-A-Way Systems</u> GSBCA 6473, 83-1 BCA ¶16202).

In the government's letter to SCI of January 10, 2003, the government attempted to rely on the "disputes" clause to compel SCI to return to work. That letter constituted a final contracting officer's decision and directed SCI to return to work. However, this final decision occurred 44 days after SCI had ceased working on the project as a result of the nonpayment of its invoices. As noted, the obligation of a contractor to continue performance of work regardless of the pendency of a dispute is not "absolute." <u>Appeal of Whited Company, Inc</u>., Supra. The board and other agency boards have held that that obligation is not absolute and have declined to enforce it in

circumstances where continued performance is discharged by supervening, objective impracticality. See, for example, Puma Chemical Co. GSBCA #5254,81-1 BCA §14,844, and cases cited at 73,280; Triple A Forestry Services, AGBCA #81-101-1,82-2BCA §15,930 at 78,940. Appeal of Drain-A-Way Systems, 83-1 BCA §16202, GSBCA #6473 held that a contractor's duty to continue performance cannot be controlled by a contract clause if the government is in breach. Citing S&W Tire Services, Inc. GSBCA #6376, 82-2 BCA §16,048 at 79,618-19. The court concluded in Drain-a-Way that the appellant was not under a contractual duty to continue performance until such time as the government had cured its antecedent material breach. In the instant case the nonpayment of SCI's invoices clearly constituted a material breach by the government.

Plaintiff qualifies as a small business contractor. When SCI suspended work in late November 2002, the project had been ongoing for three years and the government delays in issuing and funding modifications and paying invoices had subjected SCI to tremendous financial strain. SCI was already carrying over two years of extended overhead and had had problems throughout the contract with having modifications funded which very often caused SCI to work out of sequence creating a nightmare for SCI in trying to maintain subcontractors during the frequent and incredibly long delays encountered throughout the project.

It is clear that the government was in breach of its contractual obligations by failing, for a very substantial period, to make timely payments to SCI. While SCI would have been justified in terminating the contract, SCI, as it had done throughout the project, continued to try to work with the government, mitigate the delay damages and do everything it

could to complete a project that the government, despite its actions to the contrary, was desperate to complete.

Neither the contracting officer's decision nor the government's expert's analysis of the project delays ever mention the government's improper attempt to change the contract to a cost plus and the government's failure to make timely contract payments. During his deposition, the contracting officer, Edward Baker, consistently and vehemently denied any knowledge of the contract being treated as a cost plus, even when shown the government communications clearly stating that fact. Mr. Ockman testified at his deposition that he was aware that the government had stated that the contract was changed to a cost plus and back to a fixed price. He opined that the people in the government that thought the contract was a cost plus "were in error." (Ex.37, T103:2-13) However, when asked if he was aware of any actual delays in the contractor receiving payments because of the change between cost plus and firm fixed price, Mr. Ockman stated, "I did not evaluate that." (Ex.37,T88:20-25, T89:1-5)

Therefore, in analyzing the period of delay that the government's expert attributes to SCI, i.e. the period between December 19, 2002 and the date of substantial completion, September 15, 2003, it is clear that the government's expert and the contracting officer in his decision failed to take into account the fact that the government was in material breach of the contract for failing to pay invoices 29 and 30. They also failed to take into account that this breach by the government justified SCI in suspending work until the final determination was made as to the type of contract so that SCI would not continue to have its invoices bounced back to it by the government because of the government's indecision as to the type of contract

24

and, therefore, the type of invoices that should be submitted.  SCI had submitted invoice 29 on October 21, 2002 and, therefore, pursuant to the Prompt Payment Act, its payment was due 14 days later on November 4, 2002. SCI submitted invoice 30 on November 5, 2002 and, therefore, the payment on that invoice was due on November 19, 2002.  Payments on these invoices were ultimately not paid by the government until March 15, 2003 and March 28, 2003 respectively.

In an attempt to mitigate the delays, SCI initially continued to work when invoices 29 and 30 were not paid, based on the government's promise that payments would be brought current.  However, when payments were not forthcoming, SCI suspended work during the period of November 27, 2002 to January 24, 2003.  The government, realizing the problem it had caused, then established the meeting of January 17, 2003 for the purpose of working out a reasonable manner in which SCI could return to work and remobilize the subcontractors which resulted in the proposed completion date of May 2, 2003. As previously noted, the government acknowledged that date was subject to SCI confirming when its subcontractors could remobilize.  SCI's ability to meet that date was impacted by the government's continued nonpayment of the aforesaid invoices.  SCI had notified the government that it could not confirm the remobilization date of its subcontractors without assurance of payment. Therefore, SCI amended the agreement to provide for the June 14, 2003 completion date instead of the May 2, 2003 date to which the government never objected.  Also, as noted, it wasn't until SCI received the government's proposed bilateral modification P00014 on July 10, 2003 that SCI became aware that the government was taking the position that the contract completion date was December 19, 2002.  SCI submits, based on the foregoing

facts and law, the government is not entitled to any liquidated damages from December 19, 2002 to June 15, 2003.  As will be set forth in Point II, the government is also not entitled to any liquidated damages between December 19, 2002 and September 15, 2003, the date the government's expert pegs as substantial completion.

<u>POINT II</u>

<u>THE DISCOVERY OF THE DAMAGE TO BLOWER COIL UNITS AND THE DELAY IN
ISSUING THE MODIFICATION APPROVING THE EXTRA WORK AND FUNDING THE
EXTRA WORK, AT THE VERY LEAST, CONSTITUTED A CONCURRENT DELAY FOR
WHICH THE GOVERNMENT WAS RESPONSIBLE, THEREBY PREVENTING THE
GOVERNMENT FROM CHARGING SCI WITH LIQUIDATED DAMAGES FROM THE
PERIOD THE DAMAGE WAS DISCOVERED UNTIL THE WORK WAS COMPLETED</u>

By a written memo dated January 31, 2003, SCI notified the contracting officer with a priority of "urgent" the following:

> "Please be advised, that under the circumstances with the weather and this emergency shutdown of steam for heat to make repairs away from the visitor's officers' quarters building 2704. Structural Concepts, Inc. will not take responsibility for any pipes that may freeze and/or materials that freeze and require to be discarded. Should materials be lost due to the weather and loss of steam for heat, Structural Concepts, Inc. will request those materials be replaced at government expense. (Ex.38)

On May 8, 2003 SCI wrote a letter to the government advising them that, in the process of completing the controls to the blower coil units located in the mechanical rooms, SCI's mechanical subcontractor discovered that the blower units, heating and/or cooling coils had holes. It was the opinion of the mechanical contractor that they were caused by water freezing inside the coils and a list of the damaged coils was attached to the letter. SCI further stated in the letter that it was their opinion and the opinion of their mechanical contractor that the water in these coils froze when the base shut off the heat in order to perform repairs to other buildings. The heat was shut down on January 28th and was not turned on until February 4th and during this period temperatures ranged between 30 and 15 degrees with wind chill factors close to zero degrees. SCI advised that they were receiving pricing from Trane for the replacement of the damaged coils and would forward that to the contracting officer when received. The letter further noted the work would require additional time be added to the contract which would not

27

be known until a price was received and availability of parts was known. (Ex.39)

The government accepted responsibility for the damaged coils and agreed to issue a modification to pay SCI to do the repair work.  However, SCI did not receive the initial proposed bilateral modification until July 10, 2003. SCI rejected this modification because it did not provide for an appropriate extension of time related to the additional work and the two month delay in issuing the modification and it did not reflect the correct contract completion date.  The government then issued unilateral modification P00015 on August 28, 2003.  In order to mitigate project delays, SCI started the coil replacement on June 9, 2003, before receiving the modification.  This was based on a discussion with Carlen Capenos, the project inspector, when she represented that the funds were on-base and the modification was within days of being executed.  However, when the modification had still not been issued several weeks later, SCI's subcontractor refused to do any additional work on the coil replacement.  (Ex.42)

Even though SCI rejected the bilateral modification P00014 on August 25, 2003, which was received by SCI on July 10, 2003, the mechanical contractor proceeded to complete the work by September 3, 2003.  (Ex.28)

SCI's proposal for the repair of the fan coil units was submitted on May 15, 2003 and requested a 16-day contract extension.  The 16 days was based on the time SCI would need to perform testing and balancing work after the replacement of the coils.  SCI did not add time for the coil delivery and installation based on its belief that the material would be received and the repair work completed by June 14, 2003, which SCI believed to be the agreed upon contract completion date.  This was bolstered by the government's

28

representation that the modification was going to be approved shortly and the funds were on-base.  Therefore, the contractor was, in good faith, attempting to mitigate any delays by starting work without the actual signed modification.  (Ex.28)  See also affidavit of G.Moutis ¶55.

Mr. Ockman, acknowledged that a modification was necessary for the repair of the fan coil units that were damaged as a result of the government's actions or inactions.  (Ex.37,T80:10-25, T81:1-22)  However, Mr. Ockman also opined in his deposition that the fan coil units were not on the critical path and, therefore, work related to the fan coil units did not delay the project.  (Ex.37,T79:22-25, T80:1-9)

When Mr. Ockman was asked during his deposition whether he was familiar with the term "concurrent delay," he responded as follows:

> "Well, concurrent delays, when you have --- typically it's used to talk about delays that are on parallel paths, not on the critical path."  (Ex.37,T82:9-17)

Mr. Ockman was then asked

> "And what is the result of a concurrent delay?
>
> A. A current delay delays activities that aren't critical so it doesn't push the contract completion date."  T82:18-22

It is respectfully submitted that Mr. Ockman's opinion that SCI was responsible for the delay period between December 19, 2002 and September 15, 2003 failed to properly consider the impact of the fan coil repair, the government's delay in approving SCI's proposal for the work and the government's delay in issuing the modification for the additional work.  Mr. Ockman acknowledged that the contractor was entitled to a modification authorizing the performance of the fan coil.  A contractor is not required to perform work beyond the scope of the original contract until a modification

29

is issued and until that modification is funded.  Even if SCI had completed every bit of work on this project by May 8, 2003, the discovery date of the damaged fan coil units, the contract could not have been completed until the damaged fan coil units were replaced.  After discovering the damage to the fan coil units on May 8, 2003, SCI submitted its proposal to repair the damaged coil units on May 15, 2003, however, the proposal was not accepted by the government until July 10, 2003.  The actual modification, P00015 (Ex.43), was not signed until August 28, 2003 and received by SCI on September 5, 2003.  (Para. 55 of G.Moutis affidavit)  In Appeal of Whited Company, Inc., Supra, the contractor had argued that the time to complete the contract could not be considered to have expired when the government was still actively issuing change orders.  In considering that argument, the board noted:

> "It is well established that a change order, issued after all previous time extensions have lapsed, should grant the contractor sufficient time to accomplish the additional work and be commensurate with the delay impact which the new work has on the remaining contract work."  Citing Blackhawk Heating & Plumbing, Inc. BACAB #664, 72-2BCA §9573; D&E Construction Co. BACAB #561, 67-2BCA °6558."

Mr. Moutis notes in his affidavit that, in an attempt to mitigate delay damages and, based on the government's representation that the money was on base and the modification would be supplied shortly, SCI agreed to order the materials and commence work on the fan coil units prior to issuance of the modification.  However, once again, the government failed to live up to its representations and, therefore, SCI's mechanical subcontractor, having experienced problems before with delays in modifications and the funding of those modifications, indicated he would not finish the work on the failed fan coil units until a modification was received.

When the government unilaterally issued modification P000015, which authorized the repair of the damaged fan coil units, it provided that the contract was being extended 16 days, which was the amount of time requested by the contractor.  However, as previously noted, when Mr. Moutis' submitted his proposal on May 15, 2003, he anticipated having the modification approved and the work completed within the contract completion date which he believed had been extended to June 14, 2003.  This was based on the meeting with the government on January 17, 2003, which resulted in the government submitting an agreement to Mr. Moutis proposing May 2, 2003 as the completion date.  However, the government acknowledged in the minutes of the meeting (Ex.24) that the May 2nd date was subject to Mr. Moutis verifying with his subcontractors that they could remobilize by that date.  Ultimately, SCI signed the agreement and sent it back putting the date of June 14, 2003 as the completion date.  Despite having verbal representations from Carlen Capanos that she saw no problem with that date and the lack of any notice from the government that they were not accepting the June 15, 2003 completion date, modification P000015 provided for a 16-day contract extension period, which established the contract completion date as December 19, 2002.  SCI received this modification on September 5, 2003 and this was the first notification to SCI of any kind that the government was withdrawing the agreement it had sent to SCI on January 17, 2003 with a contract completion date of May 2, 2003 and which SCI had signed and returned to the government on April 1, 2003 with an amended completion date of June 14, 2003.  Therefore, the government did  not even issue a unilateral modification for the May 2, 2003 date the government had suggested in its agreement but rather, 6-1/2 months later advised the contractor that the completion date

31

was December 19, 2002.  Therefore, when Mr. Moutis submitted his proposal for the modification for the repair of the fan coil units, he was requesting a 16-day extension from the June 14, 2003 completion date that he thought had been agreed to.  The 16 days was the time needed for the balancing of the system after the fan coil repairs were completed.

The government caused delay related to this work is not simply the amount of time it took to do the work but also the amount of time it took for the government to accept SCI's proposal and then the amount of time it took the government to issue the modification and fund the modification.  Clearly, the government should not have the right to claim liquidated damages during this period of time.  Despite SCI's best efforts, the government's failure to execute the modification until August 28, 2003, (SCI did not receive it until September 15, 2003) and then the relatively short time thereafter that it took SCI to complete the work and do the balancing clearly establishes, at the very least, a concurrent delay by the government.

The import of a concurrent delay is that both parties are charged with contributing to a delay and, therefore, neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.  Coath & Goss, Inc., a corporation v. the United States, 101 Ct Cl 702 (1944).  Therefore, even if SCI was responsible for some delay after the government's alleged completion date of December 19, 2002, it is clear that the government also created a delay that prevented the completion of the contract until the issuance of the modification for the fan coil unit replacement, which was not received by SCI until September 5, 2003, after which the contractor needed time to remobilize his subcontractor to have him finish the work related to the fan coil units.  SCI does not attempt

32

at this point to suggest an apportionment that would establish that SCI is, in fact, entitled to delay damages for this period in that the purpose of this motion is simply to establish that the government cannot claim any liquidated damages during this period.

Therefore, the fact that the government was already in breach of contract when it failed to pay SCI's October and November 2002 invoices, which justified SCI suspending work from November 27, 2002 to January 7, 2003, coupled with the discovery of the frozen fan coil units and the delay in issuing the modification for that work until August 28, 2003 prevents the government from claiming any liquidated damages between the period of December 19, 2002 and September 15, 2003.  Whether or not SCI is entitled to delay damages for that period is an issue for another day.

## POINT II

### STANDARD OF REVIEW

RCFC 56 provides a summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The courts have held that no genuine issue of material fact exits when a rational trier of fact could only arrive at one reasonable conclusion. See for example Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 US 574, 587, 106 S.Ct 1348, 89 (L.Ed 2d 538 (1986). However, summary judgment will not be granted if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty, Inc. 477 US 242, 106 S.Ct. 2505, 91 L.Ed 2d 202 (1986).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, Crown Operations Int'l Ltd. V. Solutia Inc. 289 F.3d 1367 (Fed. Cir. 2002), may be discharged if the movant can demonstrate "an absence of evidence to support the nonmoving party's case [,]". Celotx Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed 2d 265 (1986).

The party opposing the summary judgment must demonstrate a genuine issue of material fact. It "cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Supra. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co., Supra

34

Plaintiff respectfully submits that the motion record, which is well supported by the government's own documents and deposition testimony establishes that there are no material factual disputes on the critical issues surrounding the question of liquidated damages. Plaintiff has given the government the benefit of the doubt, for the purpose of this motion, of the date of substantial completion. Essentially, the Court is asked to evaluate two important aspects which impacted the period during which the government alleges plaintiff was responsible for delay. These include the government's breach of contract by failure to make contract payments and plaintiff has submitted the facts and case law to support its position that the plaintiff was justified in ceasing work on the project when it was not paid. Secondly, the question of issuing a change order or modification for work which had to be completed during the period which the government claims is a contractor-caused delay that was clearly not properly credited to the contractor and, at the very least, resulted in a concurrent delay preventing the award of liquidated damages. Therefore, it is submitted that the facts are clear and the application of the law to those facts justifies plaintiff's request for the entry of a partial summary judgment on the issue of liquidated damages.

Respectfully submitted,

THOMAS J. HIRSCH

TJH:mlm

Dated: June 15, 2011

35